UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------X

SHELBOURNE GLOBAL SOLUTIONS, LLC,
SHELBOURNE GLOBAL ACQUISITIONS, LLC,      **MEMORANDUM AND ORDER**
SHELBOURNE ALF HOLDINGS, LLC, and          21-cv-2223 (KAM) (SJB)
SHELBOURNE OAKS, LLC,

                    *Plaintiffs*,

     -against-


GUTNICKI LLP, ABRAHAM A. GUTNICKI, and
STACY FLANIGAN,

                    *Defendants*.

---------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

          Plaintiff Shelbourne Global Solutions, LLC ("Shelbourne Global Solutions"), a New York private equity company, owns and manages commercial real estate. Along with its New York and Florida affiliates, Plaintiffs Shelbourne Global Acquisitions, LLC, Shelbourne ALF Holdings, LLC, and Shelbourne Oaks, LLC, Shelbourne Global Solutions sponsors various real estate purchase and development options. Plaintiffs (or collectively, "Shelbourne") brought an action against Defendants, an Illinois law firm, Gutnicki LLP, and Illinois residents Abraham Gutnicki (founder of Gutnicki LLP), and Stacy Flanigan (partner at Gutnicki LLP), asserting causes of action for legal malpractice, breach of

1

contract, and promissory estoppel related to an acquisition in which Defendants represented Plaintiffs.

Presently before the Court is Defendants' motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. (ECF No. 24.)  This motion is limited to the threshold question of whether the Court can exercise personal jurisdiction over Defendants, Illinois attorneys and an Illinois law firm, in this District to hear the suit.  For the reasons set forth below, the Court concludes that it cannot. Accordingly, Defendants' motion to dismiss is granted and the Complaint is dismissed in its entirety.

## BACKGROUND

### I.   Factual Background

Plaintiff Shelbourne Global Solutions is a limited liability company ("LLC") located in Brooklyn, New York.[1]  It is a private equity company focused on owning and managing commercial real estate.  (ECF No. 1 ("Compl.") ¶ 11.)  Plaintiffs Shelbourne Global Acquisitions and Shelbourne ALF are LLCs organized under the laws of the State of New York.  (*Id.* ¶¶ 12-13.)  Plaintiff

---

[1] For the purposes of assessing diversity jurisdiction, a limited liability company such as Plaintiffs here have the imputed citizenship of its members. *See Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000).  In response to this Court's inquiry at the July 8, 2021 pre-motion conference, Plaintiffs submitted a letter on July 11, 2021 confirming "that no member of the plaintiff entities is a resident of Illinois."  (ECF No. 15.)  Defendants do not dispute the representation that no member of Plaintiff LLCs is a resident of Illinois and therefore, that subject matter jurisdiction in this case is appropriately premised on diversity jurisdiction.

Shelbourne Oaks is an LLC formed under the laws of the State of Florida by Shelbourne Global Solutions to purchase Hidden Oaks Assisted Living Facility ("the Facility"). (*Id.* ¶ 14.)  Benjamin ("Ben") Schlossberg is a relevant nonparty in this action and a principal of Shelbourne Global Solutions.  (*Id.* ¶ 15.)

Defendant Gutnicki LLP ("Law Firm") is a law firm with only one office, located in Skokie, Illinois. (*Id.* ¶ 16; ECF No. 24-3 ("Gutnicki Decl.") ¶¶ 3-4.)  The firm does not own any property of any nature outside of Illinois.  It has never been licensed or registered to do business in New York, nor does the firm have any affiliates, subsidiaries, or employees conducting business in New York.  (Gutnicki Decl. ¶¶ 5-6.)  Gutnicki LLP does not advertise in New York, nor does it maintain any bank accounts or a telephone listing in New York.  (*Id.* ¶¶ 8-9.)

Defendant Gutnicki, a resident of Illinois, is an individual and the founder of the Law Firm.  (Compl. ¶ 17.)  He resides in Illinois and has not resided in New York since 1996. (Gutnicki Decl. ¶¶ 14-15.)  Gutnicki has never been licensed to practice law in New York, nor does he maintain any bank accounts or a telephone listing in New York.  (*Id.* ¶¶ 16-17.)

Defendant Flanigan, a resident of Illinois, is an individual and a partner of the Law Firm.  (Compl. ¶ 18; ECF No. 24-4 ("Flanigan Decl.") ¶¶ 1-2.)  She does not own property of any nature outside of Illinois and has never been licensed to practice

3

law in New York.  (Flanigan Decl. ¶¶ 3-4.)  She does not perform legal services or otherwise conduct business in New York, nor is she currently representing any clients in any lawsuits venued in New York.  (*Id.* ¶¶ 5-6.)  Finally, she does not maintain any bank accounts or a telephone listing in New York, nor does she advertise in New York.  (*Id.* ¶¶ 6-7.)

Along with its affiliates, Shelbourne Global Solutions sponsors various real estate purchase and development opportunities.  (Compl. ¶ 19.)  Prior to 2014, Plaintiffs had no experience in the healthcare sub-niche in commercial real estate.  (*Id.* ¶ 20.)  Defendant Law Firm's website specifically listed healthcare as one of its practice areas.  (*Id.* ¶ 21.)  The website also stated that Mr. Gutnicki's areas of expertise included "a special concentration in the health care industry" and that Ms. Flanigan had extensive experience in, among other areas, "health care transactions and commercial real estate."  (*Id.*)  Plaintiffs ultimately retained the Law Firm on the basis of Defendants' expertise.  (*Id.* ¶ 22.)

On May 1, 2014, the Law Firm sent Shelbourne Global Solutions an Engagement Letter regarding the firm's representation of Shelbourne in a potential acquisition of a portfolio of three skilled nursing facilities and one assisted living facility in Ohio.  The Engagement Letter memorialized that Defendant Law Firm would be engaged as legal counsel to "Mr. Ben Schlossberg,

4

Shelbourne Global Solutions, LLC . . . and his affiliated entities." The Engagement Letter does not identify any agents of the Defendants in New York, nor does it state that New York law governs any transactions or disputes. (*Id.* ¶ 23; *see also* ECF No. 25-8 ("Engagement Letter").) Schlossberg made clear to Defendants at the time of engagement that neither he nor Shelbourne's other principals had experience in healthcare and, accordingly, that they were completely reliant on Defendant Law Firm and its attorneys' expertise. (Compl. ¶ 20.)

This action arises specifically from Defendants' representation of Shelbourne in its acquisition of Hidden Oaks Assisted Living Facility ("the Facility"), located in Florida. (*Id.* ¶ 2.) Shelbourne was presented with a proposed transaction by which (1) Regal Senior Care Management, LLC ("Regal") would purchase the Facility from its then-owner through an affiliate of Regal, RSC Hidden Oaks Fort Myers, LLC ("RSC Hidden Oaks"), and (2) an affiliate of Shelbourne Global Solutions would be assigned RSC Hidden Oaks' rights under the underlying contract. (*Id.* ¶ 30.)

On August 1, 2014, Shelbourne sent to Regal's principal, Geremy Jordan, a Letter of Intent setting forth the terms under which Shelbourne would purchase the Facility and then lease the Facility to a Regal affiliate, which would then operate the Facility for Regal. (*Id.* ¶ 31.) Notably, one of the provisions

of the Letter of Intent set forth a purchase option by which Regal's operating entity would have the right to purchase the Facility from Shelbourne for a set price of $8,800,000.00. The Letter of Intent also called for an option deposit of $200,000. (*Id*. ¶ 32.) Shelbourne was represented by Defendants in connection with the assignment from Regal, as well as the lease and purchase option, which Shelbourne and Regal's counsel negotiated during August and September 2014. (*Id*. ¶¶ 33-34.) Defendants also drafted the Operating Agreement for Shelbourne ALF Holdings — the entity which had been formed to be the sole owner of the membership interests in Shelbourne Oaks — in connection with the acquisition of the Facility. (*Id*. ¶¶ 52-53.)

On October 8, 2014, RSC Hidden Oaks and Shelbourne Oaks entered into an Assignment and Assumption of Purchase and Sale Agreement (the "Assignment"). (*Id*. ¶ 38.) On the same date and concurrently with the Assignment, RSC Hidden Oaks and Shelbourne Oaks entered into the lease agreement and the purchase-option agreement, which included the provision that RSC Hidden Oaks could purchase the Facility from Shelbourne Oaks for $8,000,000. (*Id*. ¶ 40.) Plaintiffs' Complaint in this action relates to three specific provisions of the Lease Agreement, the Purchase Option Agreement, and the Operating Agreement, provisions drafted by Defendants and which Plaintiffs allege "were below the degree of

6

skill expected from a member of the legal profession." (*Id*. ¶ 95.)

### Lease Agreement

Section 19.1 of the Lease Agreement set forth the events of default thereunder, including "the institution of any proceedings against [RSC Hidden Oaks, the operator of the Facility,] by any governmental authority to either to: (i) revoke any license granted to [RSC Hidden Oaks] for the operation of the Facility as an assisted living home facility, or (ii) decertify the Facility from participation in the Medicaid reimbursement program[.]" Plaintiffs allege that either of those two events would be "fatal to the ability of the Facility to continue operating as an Alzheimer's residence or profitable assisted living facility, and thus are critical to Shelbourne's entire investment." (*Id*. ¶ 43.)

Plaintiffs claim that Sections 19.1(n) and 20.1 of the Lease Agreement, however, (1) allowed RSC Hidden Oaks to contest via legal proceedings any such government legal proceeding that threatened to adversely affect the operations of the Facility, even to shut it down completely, and (2) provided that such a contest by RSC Hidden Oaks disallowed Shelbourne Oaks from pursuing any remedies as a default under the lease resulting from the legal proceedings. (*Id*. ¶ 44.) Defendants did not

discuss Sections 19.1(n) and 20.1 with Plaintiffs during the negotiation of the Lease.  (*Id.* ¶ 46.)

### Purchase Option

Although certain terms were negotiated, Plaintiffs state that the option price of $8,800,000.00 was not negotiated nor meant by the parties to be altered.  (*Id.* ¶ 36.)  On September 29, 2014, Regal's attorney sent a draft of the Purchase Option altering the option price to $8,000,00.00.  Plaintiffs allege that the email was sent to Defendant Flanigan, who did not acknowledge or otherwise note the reduction of the option price.  (*Id.* ¶¶ 36-37.)

Plaintiffs assert that setting an option purchase price of $8,000,000 would "make no financial sense given the cost of the acquisition itself was $7,657,193.30."  (*Id.* ¶ 42.)

### Operating Agreement

Finally, the Shelbourne ALF Holdings Operating Agreement drafted by Defendants in connection with the acquisition "contain various flaws that ultimately prevented Shelbourne from taking certain management actions and resulted in significant financial losses and negative concessions on the part of certain of the Plaintiffs." (*Id.* ¶¶ 52-55.)  One such flaw was that the Operating Agreement prevented the manager of Shelbourne ALF Holdings (Shelbourne Global Acquisitions) from making an additional capital call, even if such action was necessary and recommended by their accountants.  (*Id.* ¶¶ 56-60, 89.)

8

In sum, Plaintiffs allege that, but for Defendants'
legal malpractice (i.e., Defendants' multiple mistakes over the
course of their representation in the Hidden Oaks acquisition),
Plaintiffs could have avoided significant monetary damages of at
least $16,031,302. (*Id*. ¶ 104.)

## II.  **Procedural History**

Plaintiffs filed their Complaint on April 22, 2021,
alleging a claim of legal malpractice against all Defendants, and
claims of breach of contract and promissory estoppel against
Defendant Law Firm and Defendant Gutnicki. (Compl. ¶¶ 92–115.)
Plaintiffs seek damages in the amount of $16,031,302. (*Id*. at
19.)

On June 29, 2021, Defendants filed a letter requesting
a pre-motion conference for their motion to dismiss the Complaint
for lack of personal jurisdiction, pursuant to Fed. R. Civ. P.
12(b)(2). (ECF No. 12.) Plaintiffs responded in opposition (ECF
No. 14), and this Court held a pre-motion conference on July 8,
2021. At the conference, the Court advised the parties that
preliminary jurisdictional discovery would be permitted before
motion practice. (07/08/2021 Minute Entry and Order.)
Jurisdictional discovery was conducted under the supervision of
Magistrate Judge Bulsara. In a Minute Entry and Order dated
February 22, 2022, Judge Bulsara ordered that the "close of
jurisdictional discovery [is] extended to 4/8/2022 for the limited

purpose of permitting Plaintiffs to depose the individual(s) Defendants intend to rely upon in connection with their motion to dismiss" and that "jurisdictional discovery is otherwise deemed closed." (02/22/2022 Minute Entry and Order).

The motion to dismiss for lack of personal jurisdiction is now fully briefed and ripe for decision.

## LEGAL STANDARD

In order to defeat a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), a plaintiff "bears the burden of demonstrating that the court has personal jurisdiction over a person or entity against whom it seeks to bring suit." *See Troma Ent., Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (internal quotations and citation omitted). The court may rely on materials outside the pleadings, "including any affidavits submitted by the parties." *LaRoss Partners, LLC v. Contact 911 Inc.,* 874 F. Supp. 2d 147, 152 (E.D.N.Y. 2012). Where a court "relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, [a plaintiff] need only make a prima facie showing of personal jurisdiction over the defendant." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008) (internal quotations and citation omitted). The court must construe the pleadings and affidavits in the light most favorable to plaintiff, and doubts must be resolved in the plaintiff's favor, notwithstanding a controverting presentation by

10

the moving party.  *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

Although the court "will not draw 'argumentative inferences' in the plaintiff's favor," the court must "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  In the instant case, the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held.  Accordingly, "plaintiffs' *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 163 (2d Cir. 2010) (cleaned up).

## DISCUSSION

"A court sitting in diversity applies the law of the forum state in determining whether it has personal jurisdiction over the defendants." *Agency Rent A Car Sys. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *see also D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).  If personal jurisdiction is established pursuant to the state's long-arm statute, the court must then assess whether assertion of jurisdiction comports with constitutional due process.  *See*

11

*Metro. Life Ins. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996); *D.H. Blair & Co.*, 462 F.3d at 104.

In relevant part, New York's long-arm statute, New York Civil Practice Law and Rules ("CPLR") Section 302(a), provides that as to a cause of action "arising from any of the acts enumerated in this section," a court may "exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent":

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>
>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>>
>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
>
> 4. owns, uses or possesses any real property situated within the state.

N.Y. CPLR § 302(a).

Here, Plaintiffs have asserted jurisdiction under CPLR sections 302(a)(1), 302(a)(3)(i), and 302(a)(3)(ii).  (*See generally* ECF No. 25-1 ("Pl. Mem.") at 10-14.[2])  The Court shall address each of these three subsections in turn.

## I.   CPLR § 302(a)(1)

### A. Legal Standard

Plaintiffs rely first on Section 302(a)(1), which confers jurisdiction over a non-domiciliary who "in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." CPLR 302(a)(1).  "Section 302(a)(1) is typically invoked for a cause of action against a defendant who breaches a contract with plaintiff, or commits a commercial tort against plaintiff in the course of transacting business or contracting to supply goods or services in New York."  *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 764 (2d Cir. 1983) (citations omitted); *Eastboro Found. Charitable Tr. v. Penzer,* 950 F. Supp. 2d 648, 658 (S.D.N.Y. 2013); *see also Longines-Wittnauer Watch Co. v. Barnes & Reinecke*, 15 N.Y.2d 443, 466 (N.Y. 1965) (finding that CPLR § 302(a)(1) also applies "to actions in tort when supported by a sufficient showing of facts").

---

[2] All pagination pin citations refer to the page number assigned by the Court's CM/ECF system.

In order to evaluate if the statute is satisfied, the court analyzes (1) whether the defendant "transacts any business" in New York and, (2) if so, whether the cause of action "aris[es] from" such a business transaction. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citing *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 850 N.E.2d 1140, 1142 (N.Y. 2006)).

For purposes of CPLR § 302(a)(1)'s "transaction of business" test, "the overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 61 (2d Cir. 2012). As for "arising from," a suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines, Inc.,* 490 F.3d at 246. "To determine whether a sufficient nexus exists, a court must evaluate the 'totality of the circumstances surrounding defendants' activities in New York in connection with the matter giving rise to the lawsuit." *Saudi v. Marine Atl., Ltd.,* 306 F. App'x 653, 654 (2d Cir. 2009) (summary order) (citing *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1109 (2d Cir. 1997) (internal citation omitted)).

The test under CPLR § 302(a)(1) "is hardly a precise one; the court must look at the aggregation of defendant's activities, coupled with the selective weighing of the various actions." *Eastboro Found. Charitable Trust v. Penzer,* 950 F. Supp. 2d 648, 658 (S.D.N.Y. 2013) (internal quotations omitted). "Moreover, it is the nature and quality, and not the amount of New York contacts [which] must be considered by the court." *Id.* (internal quotations omitted); *see also Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*, 2015 WL 5751252, at *4-5 (S.D.N.Y. Sept. 30, 2015).

### B. Legal Malpractice Claim

#### i. Defendants' Provision of Legal Services

For a court to exercise personal jurisdiction over a party under CPLR § 302(a)(1), "the party need not be physically present in the state at the time of service," *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999), however, "New York courts 'have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communications from another locale with a party in New York.' " *Bissonnette v. Podlaski*, 138 F. Supp. 3d 616, 623 (S.D.N.Y. 2015) (citing *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 766 (2d Cir. 1983)); *see also Penn Grp., LLC v. Slater*, 2007 WL 2020099, at *10 (S.D.N.Y. June 13, 2017) ("[E]ven substantial negotiations conducted by mail, telephone,

or electronic communications often do not confer jurisdiction."). Moreover, in the context of legal services, courts in the Second Circuit have regularly found that providing legal services or representation for clients who happen to be domiciled in New York is not sufficient to constitute "transaction of business." *See Bank Brussels Lambert*, 171 F.3d at 787 (2d Cir. 1999) (finding that Puerto Rico-based law firm performed all of its legal research and writing services in preparing an opinion and closing relevant security documents in Puerto Rico; that none of the firm's partners or agents entered New York or were required to be physically present to perform any of those services; and therefore the action against Defendants did not arise out of any alleged New York business solicitations, as would be required under § 302(a)(1)); *Mayes v. Leipziger*, 674 F.2d 178, 184-85 (2d Cir. 1982) (noting that "[d]efendants were not to perform their services in New York" and "[t]here was no activity in New York in which defendants sought to participate"); *cf. Monbo v. Nathan*, 2022 WL 4591905, at *48 (E.D.N.Y. Aug. 26, 2022) ("[M]ore limited contacts regarding services to be performed outside New York would not satisfy [section] 302(a)(1).") (citing *Yih v. Taiwan Semiconductor Mfg. Co.,* 815 Fed. App'x 571, 574 (2d Cir. 2020) (summary order)).

Here, no attorneys or employees of Defendant Law Firm "were ever physically present in New York in connection with the transactions at issue in the Complaint." (Gutnicki Decl. ¶ 11; Flanigan Decl. ¶¶ 8-9.) Moreover, Defendants did not solicit Plaintiffs' business — rather, Defendant Gutnicki and Defendant Law Firm were recommended by Nathan Katz, a New York resident and broker on the deal. (ECF No. 25-7 ("Schlossberg Decl.") at ¶¶ 3-4); *see Bank Brussels Lambert*, 171 F.3d at 787 (noting that Bank Brussels Lambert's Vice President conceded that the Defendant law firm "was proposed by Chase [New York], and was contacted to perform legal services on the basis of this recommendation") (internal quotations omitted); *Bissonnette*, 138 F. Supp. 3d at 624 (finding that, among other reasons, personal jurisdiction under § 302(a)(1) could not be exercised because Defendants had not solicited Plaintiff's business). There is no indication in the record before the Court that Defendants' "direct and personal involvement on [their] own initiative projected [themselves] into New York to engage in a sustained and substantial transaction of business." *See Aquiline Cap. Partners v. Finarch, LLC*, 861 F. Supp. 2d 378, 386 (S.D.N.Y. 2012) (cleaned up); *cf. Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*, 2015 WL 5751252, at *4 (S.D.N.Y. Sept. 30, 2015)).

Plaintiffs also rely on the fact that Defendants drafted the Shelbourne ALF Operating Agreement, "a document

17

governing a New York LLC, under New York Law." (Schlossberg
Decl. at 3; *see also* ECF No. 25-9 ("Operating Agreement") at
32.)  This fact alone, however, does not call for a different
conclusion.  Although the Operating Agreement itself was
governed by New York law, Defendants' own engagement letter with
Plaintiff provides no choice-of-law provision, or otherwise
suggests that the engagement letter was governed by New York
law, nor does the record reflect that Defendants "agree[d] to
provide, or actually provide[d], representation in New York
related to" the Operating Agreement. *See Bissonnette*, 138 F.
Supp. 3d, at 625 (holding that Defendants never "projected
themselves" into the underlying New York transaction by, for
example, "actively and extensively negotiating the [underlying
contract] on behalf of Plaintiff in New York in the first
instance").

        *ii. May 8, 2014 Meeting*

        Plaintiffs rely heavily on a May 8, 2014 meeting
between Defendant Gutnicki, representatives of Shelbourne, and
Mr. Katz in New York.  (Pl. Mem. at 13; Schlossberg Decl. ¶ 5.)
At that meeting, the participants discussed the deal that was
then under consideration for which Plaintiffs retained Defendant
Law Firm and Defendant Gutnicki (a deal which ultimately did not
proceed), Shelbourne's business generally, and Gutnicki's
further representation of Shelbourne in future healthcare-

18

property transactions.  (Pl. Mem. at 13; Schlossberg Decl. ¶¶ 5-7.)  Plaintiffs assert that "[a]lthough the originally proposed transaction did not proceed, given the expectation that Shelbourne would be represented by Gutnicki and his firm in the future, Gutnicki LLP kept the retainer check, the majority of which had not been earned because the proposed transaction did not proceed," the original engagement letter was the effective engagement letter for Defendants' representation of Plaintiffs in the Hidden Oaks transaction, and that the original retainer payment was paid toward the attorneys' fees generated by Gutnicki LLP for the Hidden Oaks transaction.  (*See* Pl. Mem. at 13.)  Although Plaintiffs broadly argue that personal jurisdiction is established because "Plaintiffs' claims arise from Defendants' business in the State of New York."  (*id*. at 12), other than describing the contents of the meeting, Plaintiffs make no specific arguments in support of this conclusory statement.  *See, e.g., Hume v. Lines*, 2016 WL 1031320, at *12 (W.D.N.Y. Mar. 8, 2016) (holding that generalities such as that the out-of-state defendant is "authorized to do business in the State of New York" and that it is "a business entity doing business within the State of New York" do not form a basis for specific jurisdiction which requires "that the claims arise specifically from the defendant's in-state contacts").

19

As an initial matter, courts are "skeptical of attempts to assert personal jurisdiction over a defendant based on a single meeting in New York, especially where that meeting did not play a significant role in establishing or substantially furthering the relationship of the parties." *See Gordian Grp., LLC v. Syringa Expl. Inc.*, 168 F. Supp. 3d 575, 587 (S.D.N.Y. 2016) (citing *Posven, C.A. v. Liberty Mut. Ins. Co.*, 303 F. Supp. 2d 391, 398 (S.D.N.Y. 2004)); *see also Three Five Compounds, Inc. v. Scram Techs., Inc.*, 2011 WL 5838697, at *4–5 (collecting cases). "When a single meeting in New York is not related to the negotiation of a contract, courts afford it even less weight." *Gordian Grp., LLC.,* 168 F. Supp. 3d at 587 (citing *CutCo Indus. Inc. v. Naughton*, 806 F.2d 361, 368 (2d Cir. 1986) (holding that a party's visit to New York after a contract was formed "should be considered jurisdictionally irrelevant inasmuch as attempts to renegotiate an existing contract do not constitute a CPLR 302 'transaction of business'"); *Three Five Compounds*, 2011 WL 5838697, at *11–12 (concluding that meetings that "did not occur during contract negotiations and did not result in any contract" did not amount to the transaction of business); *Lamco Grp. Inc. v. Universal Life Ins. Co.*, 903 F.Supp. 612, 613 (S.D.N.Y. 1995) (determining that personal jurisdiction was lacking when "defendant's only visit to New York occurred after the execution of the contract"

20

and "[t]he visit was unproductive in that it did not result in the sale of defendant's company"); *PaineWebber v. WHV, Inc.*, 1995 WL 296398, at *3 (S.D.N.Y. May 16, 1995) (deciding that the court could not exercise personal jurisdiction over defendant who attended three meetings in New York)).

Here, the parties had executed an engagement letter memorializing Defendants' representation on May 1, 2014, *prior* to the May 8, 2014 meeting.  (Schlossberg Decl. ¶¶ 4-5.)  In other words, the single meeting occurred after the contract between the parties had already been executed.  Though the parties discussed "Shelbourne's business generally," and "Gutnicki's further representation of Shelbourne in future healthcare-property transactions," Plaintiffs do not allege other facts from which the Court could infer how the meeting "substantially furthered" the parties' relationship — it could well be said that those general discussions about hypothetical additional work were merely in conjunction with the terms of the engagement letter discussing "scope of representation."  (*See* ECF No. 25-8 at 1.)  Plaintiffs do not allege details, for example, about the length of the meeting; if the parties agreed to any further developments of their relationship's scope at that meeting; or whether any business decisions were made at that meeting.

Particularly in light of courts' hesitance to assert personal jurisdiction on the basis of one single meeting and in light of cases where courts find jurisdiction based on more than one meeting, the Court declines to find that the May 8, 2014 meeting satisfies such a standard. *See, e.g., CutCo Indus. Inc.,* 806 F.2d at 367-68 (finding a visit to New York had jurisdictional significance because the visit was "instrumental in [a party's] decision to open additional franchises" and "resulted in the acquisition of an additional salon and a new franchise agreement"); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.* 763 F.2d 55, 57, 59 (2d Cir. 1985) (finding that the cause of action arose out of the transaction of business in New York because, among other contacts with the state, the out-of-state defendant visited plaintiff in New York 54 times at "frequent intervals over approximately a ten-year period," and because those meetings discussed "virtually every aspect of the franchised business").

Further, although Plaintiffs argue that the 2014 engagement letter "covered the Hidden Oaks transaction," citing to Gutnicki's deposition, the submitted deposition itself does not support an inference that the Hidden Oaks acquisition had been contemplated at the time the engagement letter was signed or at the time of the May 8, 2014 meeting.

22

**Q:** Right, so was this – you know, was this engagement letter considered to cover the Hidden Oaks transaction, as well?

**A:** Are you asking me at the time that it was signed whether it was contemplated that this engagement letter would include the Hidden Oaks transaction?

**Q:** I'll ask another way.  Did you execute another engagement letter subsequent to this with Shelbourne?

**A:** I don't believe so.

(ECF No. 25-5 ("Gutnicki Dep.") at 22.)

As the Court cannot "draw argumentative inferences in the plaintiff's favor," the only inference that the cited portion supports is that the original engagement letter between the parties was the one in effect by the time Defendants' representation in the Hidden Oaks transaction began.  *See Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) ("In determining whether a plaintiff has met this burden, we will not draw 'argumentative inferences' in the plaintiff's favor.").

Here,  Shelbourne had not even sent the Letter of Intent to Regal Senior Care about the Hidden Oaks acquisition until August 1, 2014, almost three months after Gutnicki's one meeting in New York.  Plaintiffs themselves state that the negotiations between Shelbourne and Regal's counsel took place in August and September 2014.  (Compl. ¶¶ 31, 33.)  It cannot be

23

said that when a meeting involves a transaction "completely
unrelated to the [] transaction that is the subject of [the]
action," a plaintiff's claims "arise from or are based on" that
unrelated transaction.  *See Eastboro*, 950 F. Supp. 2d at 662;
*see also Newmont Mining Corp. v. AngloGold Ashanti Ltd.*, 344 F.
Supp. 3d 724, 736 (S.D.N.Y. 2018) (stating that a single act or
transaction could be sufficient to invoke jurisdiction **so long
as** the relevant New York activities "were purposeful and **there
is a substantial relationship between the transaction and the
claim asserted**") (emphasis added) (internal quotations and
citation omitted).[3]

   *iii. Defendant Law Firm's Alleged Advertising*

   Plaintiffs also argue that Defendants "project
themselves into the New York market" on the grounds that the

---

[3] The single case that Plaintiffs cite here, *Grand River Enter. Six Nations,
Ltd. v. Pryor*, is not applicable to the instant case.  425 F.3d 158 (2d Cir.
2005).  Plaintiff characterizes *Grand River* as holding that the "relationship
between negotiation and signing of agreement in New York, and antitrust claim
created nexus in New York."  (Pl. Mem. at 12-13.)  Unlike the instant action,
in *Grand River*, the Second Circuit found that § 302(a)(1)'s "transacts any
business" requirement was satisfied because, *inter alia*, non-New York based
attorneys had spent five months negotiating an agreement in New York;
defendants agreed to submit to the jurisdiction of New York state courts to
resolve any dispute arising under the agreement; and the execution of the
agreement itself took place in New York.  *Grand River,* 425 F.3d at 166-67.

Here, the record does not reflect, nor do Plaintiffs allege, that the
engagement letter with Defendants was negotiated or executed in New York, nor
— as explained above — did the engagement letter reflect any agreement by
Defendants that they would submit to the jurisdiction of New York state
courts in the event of a dispute arising under the engagement letter.  *Cf.*
*Grand River*, 425 F.3d at 167 ("[B]ecause these negotiations were carried on
in New York, it was foreseeable that appellants would be subject to suit in
the state.")

firm's website states "health care" as one of its practice areas and states that "Gutnicki LLP has handled matters throughout the United States for clients that range from major financial institutions to successful entrepreneurs."  (Pl. Mem. at 6, 11; ECF No. 25-3 at 2.)

"Without any evidence that Defendants used their website or other promotional materials to interact with or solicit New York clients, the mere characterization of Defendants' practice as 'nationwide' does not suffice to establish purposeful availment of the privilege of doing business in New York." *Bissonnette v. Podlaski,* 138 F. Supp. 3d 616, 628 (S.D.N.Y. 2015) (citing *Royalty Network Inc. v. Dishant.com, LLC,* 638 F. Supp. 2d 410, 424 (S.D.N.Y. 2009) (finding that the plaintiff had not established that, through their website, "defendants purposefully targeted New York's Indian American population or otherwise targeted their activities toward the state")); *cf. Parker Waichman Alonso LLP v. Orlando Firm, P.C.,* 2010 WL 1956871, at *10 (S.D.N.Y. May 14, 2010) (finding "tangible manifestations" of the defendants' attempt to reach the New York market through "its statement on its home page that it helps customers 'across the country,' and **its act of signing up six New York clients who allegedly got to it via the website**") (emphasis added); *cf. Yih v. Taiwan Semiconductor Mfg. Co.,* 815 Fed. App'x 571, 574 (2d Cir. 2020)

25

(summary order) ("Even had the website mentioned New York, this evidence would still be inadequate because passive websites, which merely impart information without permitting a business transaction, are generally insufficient to establish personal jurisdiction.") (internal quotations and citation omitted); *see also Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 252 (2d Cir. 2007) (stating that, in analyzing personal jurisdiction under Section 302(a)(1) based on e-commerce, the touchstone remains "whether the defendant, through the website, purposefully avail[ed] himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws" (internal quotation marks omitted)).  Here, Plaintiffs have not alleged, let alone produced support for the idea, that Defendant Law Firm used its website specifically to target New York customers, geared its business specifically towards the New York market, or ever acquired New York clients on the basis of that one sentence on its webpage.

Plaintiffs also argue that Defendants projected themselves into the New York market because Gutnicki LLP was listed as a sponsor of the "H3 Business Halacha Summit" that took place in December 2021.  (Pl. Mem. at 6-7, 11; ECF No. 25-4 at 2-5.)  The event is a summit where "professionals and business people and employees of different companies get together to educate themselves on how Jewish law interplays with

26

their day-to-day business activities." (Gutnicki Dep. at 19.) Plaintiffs rely on the following assertions: H3 summit was "advertised nationally to Agudath Israel's members," Agudath Israel's "constituency is Haredi Orthodox Jews," and both Agudath Israel and its constituents are "centered in New York and Northeast." (Pl. Mem. at 11-12.) Notably, Plaintiffs fail to mention that the H3 Summit takes place in Illinois. (ECF No. 26 ("Def. Reply") at 8.) Plaintiffs' arguments are convoluted and lack merit.

In short, the Court would have to conclude that Gutnicki's sponsorship of this Illinois event somehow constituted Defendants availing themselves of the privilege of conducting activities within New York, based on Plaintiffs' assertion that the summit was "advertised to significant numbers of New York residents, which [] includes a significant number of potential clients for Gutnicki LLP" — a statement based upon a single email sent by a non-party to this case, not to Plaintiffs themselves, but to Plaintiff's counsel. Plaintiffs have not cited to any case that would compel the Court to accept such an indirect chain of inferences, nor have Plaintiffs made further allegations that could support such a conclusion, such as, for example, whether Defendants ever acquired New York clients or New York business based on their sponsorship of the event.

In any event, even assuming Gutnicki's sponsorship of an Illinois event somehow constituted "transacting business" in New York, which it does not, it cannot be said this cause of action "arose from" such business, as both the email (dated December 15, 2021), and the H3 summit (December 22-23, 2021) significantly postdated the events underlying Plaintiffs' Complaint.  (ECF No. 25-4 at 1); *see, e.g., Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 52 (2d Cir. 1991) ("[P]ersonal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed.") (citing 4 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1051, at 160-62 (1987)).

### C. Breach of Contract and Promissory Estoppel Claims

To determine whether a party in a contract action has "transacted business" in New York, within the meaning of § 302(a)(1), the Second Circuit has articulated the following factors: (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv)

whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state. *See Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 22 (2d Cir. 2004). Additionally, no single factor is dispositive. Rather, a finding of personal jurisdiction in this context must be based upon the totality of the circumstances. *See Wego Chem. & Min. Corp. v. Magnablend Inc.,* 945 F. Supp. 2d 377, 383 (E.D.N.Y. 2013).

Plaintiffs' breach of contract and promissory estoppel claims against Defendant Law Firm and Defendant Gutnicki are based upon the following allegations: Plaintiffs claim that when they brought the incorrect purchase price in the Purchase Option to the attention of Defendants, Defendants attributed the mistake to a scrivener's error and "encouraged Plaintiffs not to take any action against them" and that in order to "induce Plaintiffs not to take such action, Gutnicki and the Law Firm offered to make Plaintiffs whole for the reduced amount." (Compl. ¶¶ 63-65.) Plaintiffs maintain that they "relied on Gutnicki's and the Law Firm's promises and complied with their side of the agreement by not taking action that would trigger an insurance claim by Gutnicki and the Law Firm" and "attempted to alleviate the loss in the course of a sale transaction in accordance with the Law Firm and Gutnicki's request." Plaintiffs further allege that Gutnicki and the Law Firm have

29

failed to compensate Plaintiffs, and that as a result of their reliance on the promise, Plaintiffs "lost significant time to seek an alternative sale or take legal action against the defendants, and further were damaged by the chain of events that occurred due to the loss of Regal's license to operate the Facility."  Plaintiffs do not allege that Defendants' offer and request for forbearance were reduced to writing, much less a writing executed in New York.  (*See id*. ¶¶ 63-65; 105-115.)

In response, Defendant Gutnicki declares: "I understand that Plaintiffs allege that I made a promise, on behalf of Gutnicki LLP, to 'make Plaintiffs whole' for the alleged 'scrivener's error' in the lease agreement.  I had a telephone conversation with Ben Schlossberg, who is affiliated with Plaintiffs, about this. I conducted this call from the state of Illinois.  No agreement was ever reached or formalized regarding making 'Plaintiffs whole.' "  (Gutnicki Decl. ¶¶ 23-25.)

Although the first factor may lean in Plaintiff's favor because the parties had an ongoing contractual relationship based on Defendants' agreement to represent Plaintiffs, consideration of the other factors weigh against finding personal jurisdiction.  Defendant Gutnicki participated in the phone call regarding the alleged oral contract in Illinois, and there was never a formal contract that was

negotiated or executed in New York, or even allegations that the parties continued discussing "making Plaintiffs whole" in New York.  *See Hume*, 2016 WL 10313120, *12 ("[T]here is nothing indicating that [out-of-state defendant] visited New York at any time for any reason to negotiate or consult with anyone regarding this agreement.")  Finally, nothing in the record points to any choice-of-law clause in the alleged contract, nor anything regarding performance of the alleged contract, notice, payment, or supervision, again because any oral agreement from the phone call was not formalized or memorialized.  Therefore, the factual allegations and record do not support a proper exercise of personal jurisdiction over Defendants as to Plaintiffs' breach of contract and promissory estoppel claims pursuant to § 302(a)(1).

## II.  CPLR § 302(a)(3)

### A. Legal Standard

The Court now turns to Plaintiffs' argument for the exercise of § 302(a)(3) personal jurisdiction over Defendants for Plaintiffs' legal malpractice claim.  This provision requires a plaintiff to make a *prima facie* showing that (1) the defendant committed a tortious act outside New York; (2) the cause of action arises from that act; and (3) the act caused injury to a person or property within New York.  In addition, the plaintiff must show that (4) the defendant either (i)

31

regularly does or solicits business, or engages in any other
persistent course of conduct, or derives substantial revenue
from goods used or consumed or services rendered, in the state,
per § 302(a)(3)(i) or (ii) expects or should reasonably expect
the act to have consequences in the state and derives
substantial revenue from interstate or international commerce,
per § 302(a)(3)(ii). *See Logistic Dynamics, LLC v. Rood
Logistics LLC,* 2022 WL 17833277, at *2 (W.D.N.Y. Dec. 21, 2022);
*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir.
2010); *see also* CPLR § 302(a)(3).

Plaintiffs here argue that the Court could exercise
personal jurisdiction over Defendants under either subprovision
of § 302(a)(3).

### B. Application

To determine whether there is an injury in New York
sufficient to warrant a finding of § 302(a)(3) jurisdiction,
courts must generally apply a situs-of-injury test, specifying
that the "situs of the injury is the location of the original
event which caused the injury, not the location where the
resultant damages are felt by the plaintiff." *Timothy Coffey
Nursery Landscape Inc. v. Soave*, 760 Fed. App'x 58, 61 (2d Cir.
2019) (summary order) (citing *Whitaker v. Am. Telecasting, Inc.*,
261 F.3d 196, 209 (2d Cir. 2001)).

Residence or domicile of the injured party within New York is not a sufficient predicate for jurisdiction under § 302(a)(3).  *Troma Ent. Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 218 (2d Cir. 2013).  As such, it is well-settled in the Second Circuit that allegations of "remote or consequential injuries such as lost commercial profits which occur in New York only because the plaintiff is domiciled or doing business here" are insufficient to support the exercise of jurisdiction over a defendant.  *Id.* (citing *Lehigh Valley Indus. v. Birenbaum,* 527 F.2d 87, 94 (2d Cir. 1975); *see also Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.,* 439 F.2d 428, 433 (2d Cir.1971) (rejecting as insufficient "harm in New York in the sense that any sale lost anywhere in the United States affects [the plaintiff's] profits")).  In short, "[t]he suffering of economic damages in New York is insufficient, alone, to establish a direct injury in New York for N.Y. C.P.L.R. § 302(a)(3) purposes."  *Id.*

Here, it is clear that Plaintiffs cannot satisfy the third element.  Plaintiffs' Complaint and submissions make no reference to the alleged injury at all, let alone what constituted the "original event which caused their injury" or the "situs of their injury."  (*See generally* Pl. Mem. at 13-14.) The Court notes that the situs of the alleged legal malpractice would either be Illinois — where Defendants' services in

33

connection with the Hidden Oaks acquisition were rendered — or

in Florida, where the Hidden Oaks facility is actually located.

In either case, it is evident from the record that the situs of

the injury is not New York, as is required under the statute.

That alone would suffice to bar the exercise of § 302(a)(3)

jurisdiction in this case.  Moreover, the harm that Plaintiffs

assert in the Complaint resulted from Defendants' alleged legal

malpractice, causing economic damages in the amount of

$16,031,302.  (*See* Compl. ¶ 104 ("But for Defendants' legal

malpractice, Plaintiffs could have avoided significant monetary

damages in amount to be proven at trial but at least

$16,031,302."); *see also* Compl. at 19.)  Although, again,

Plaintiffs have not specified where such monetary injury took

place, the Court can best infer that Plaintiffs' are alleging

that they suffered such economic damages in New York.

Consequently, § 302(a)(3) is not a sufficient basis to exercise

personal jurisdiction over Defendants.  *See Whitaker*, 261 F.3d

196 at 209 ("The occurrence of financial consequences in New

York due to the fortuitous location of plaintiffs in New York is

not a sufficient basis for jurisdiction under § 302(a)(3) where

the underlying events took place outside New York.") (internal

quotations and citation omitted).

Plaintiffs have also failed to assert a *prima facie*

showing that Defendants "regularly do[] or solicit[] business,

or engage[] in any other persistent course of conduct" in New York, or "derive[] substantial revenue from interstate or international commerce."  Plaintiffs broadly state that Defendants solicit business in New York, based upon its advertisement through the H3 Summit; that a "significant portion of the firm's client pool is centered in New York"; and that Defendants Law Firm's attorneys "do appear on behalf of clients in New York courts, including healthcare clients."  (Pl. Mem. at 13-14.)

First, the Court has previously stated why Plaintiffs' reliance on the H3 Summit is insufficient to establish personal jurisdiction.  Second, Plaintiffs have not cited to nor produced any records in support of their conclusory allegations that the firm's attorneys appear on behalf of clients in New York courts. The Court assumes that Plaintiffs' allegation relies on the following:

- Defendant Gutnicki's sworn statements that "two attorneys from Gutnicki LLP . . . were admitted *pro hac vice* in a lawsuit venued in the Supreme Court of the State of New York, New York County."  (Gutnicki Decl. ¶ 12.)  Gutnicki also declares that that lawsuit was not commenced until April 24, 2021, two days after the Complaint in this action was filed; that local New York counsel is also representing the

client in that lawsuit; that the lawsuit is
unrelated to the allegations in this action; and
that neither *pro hac vice* attorney was involved in
providing the legal services at issue.  (*Id.* ¶ 13.)

The Court is hard-pressed to conclude — nor have
Plaintiffs even affirmatively argued — that the appearance of
two *pro hac vice* attorneys in a single New York lawsuit is
sufficient to constitute "regularly" doing or soliciting
business in the state, or to constitute a "persistent course of
conduct," particularly when that lawsuit was unrelated to the
issue giving rise to this action, and when those two *pro hac
vice* attorneys had no involvement in the underlying legal
services.

As to Plaintiffs' claim that a "significant portion of
the firm's client pool is centered in New York," Plaintiffs have
again failed to provide sufficient support to make a *prima facie*
showing.  Plaintiffs rely primarily on the following:

- Defendant Gutnicki's statements from his deposition
  that the firm has "clients that reside in the State
  of New York"; Gutnicki's acknowledgement in the
  deposition that "perhaps more than five" of the
  firm's clients reside in New York; and his response
  of "most likely" when asked whether any of those
  clients "engage[d] in more than one transaction

36

since January 1, 2021 [in which] they were

represented by the firm."  (Gutnicki Dep. at 11-12.)

Importantly, "New York courts decline to base the

exercise of personal jurisdiction on the mere fact that an

attorney's client was a New York resident where, as here, New

York law was not implicated and the representation had no

connection to New York."  *See Eastboro Found. Charitable Tr. v.*

*Penzer,* 950 F. Supp. 2d 648, 663 (S.D.N.Y. 2013).  The record

bears no facts regarding which state's laws were implicated in

Defendant Law Firm's prior matters, or any facts regarding

Defendant Law Firm's representation of any such New York-based

clients.  In fact, Gutnicki also stated in his deposition that

"I do not believe since January 1, 2021, we handled many, if

any, deals or matters . . . where the assets being acquired or

sold or financed, for that matter, were located in the State of

New York."  (Gutnicki Dep. at 12.)

Moreover, Plaintiffs have also made no showing that

Defendants "derive[] substantial revenue from . . . services

rendered in the state," under either § 302(a)(3)(i) or (ii).

Plaintiffs allege that "Gutnicki claims to be unaware of the

gross revenue and overall percentage of revenue generated by New

York-based clients [of the firm]" and that Gutnicki "reviewed no

documents in preparation for the deposition."  (Pl. Mem. at 14

n.4.)  Defendants, in turn, state that Plaintiffs never served a

37

Fed. R. Civ. P. 30(b)(6) "Notice or Subpoena Directed to an
Organization" upon Defendant Law Firm. (Def. Reply at 13.)  The
Court reiterates that Plaintiffs bear the burden of
demonstrating that the Court has personal jurisdiction over the
parties. *See Troma Ent., Inc.*, 729 F.3d at 217.  Such a burden
would reasonably include taking advantage of the opportunity to
conduct pre-motion jurisdictional discovery as was granted,
which could have included, for example, serving an Fed. R. Civ.
P. 30(b)(6) notice that "must describe with reasonably
particularity the matters for examination," prior to Magistrate
Judge Bulsara's Minute Entry and Order stating that "[t]he close
of jurisdictional discovery is extended to 4/8/2022 for the
limited purpose of permitting Plaintiffs to depose the
individual(s) Defendants intend to rely upon in connection with
their motion to dismiss." (*See* 02/22/2022 Minute Entry and
Order.)  A deposition conducted under a Fed. R. Civ. P. 30(b)(6)
notice or subpoena would likely have provided Plaintiffs with a
better means of obtaining information regarding Defendant Law
Firm's exact revenue figures and percentages of New York clients
or New York transactions.  Further, Defendants represent that,
despite the opportunity to conduct jurisdictional discovery,
"Plaintiffs never asked for the production of documents or
information bearing on jurisdiction, like Gutnick[i] LLP's
revenue, client base, and their connection to New York." (Def.

38

Reply at 12-13.)   The only reasonable inference the Court can make is that Defendants' representation is correct, as no such documents were referenced by Plaintiffs, let alone produced to the Court as part of the record.   Even construing the pleadings and affidavits in the light most favorable to Plaintiffs here, the Court cannot find that Plaintiff has included "an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over [Defendants]."   *See Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 163 (2d Cir. 2010).

## III. **Constitutional Due Process**

As the Court has found that there is no personal jurisdiction over Defendants under New York's long-arm statute, an analysis of whether exercising personal jurisdiction would comport with constitutional principles of due process is not necessary here.   *See, e.g., Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) ("[E]xcept where the long-arm statute permits jurisdiction to the extent permitted by principles of Due Process — as it commonly does in states other than New York — analysis under Due Process principles is not necessary unless there is long-arm jurisdiction under the applicable state statute.").

39

## CONCLUSION

For the foregoing reasons, the motion to dismiss the Complaint for lack of personal jurisdiction is GRANTED.  The Clerk of Court is directed to enter judgment, and to close the case.

**SO ORDERED.**

DATED:     February 27, 2023
           Brooklyn, New York

           _____
           **HON. KIYO A. MATSUMOTO**
           United States District Judge